IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | No. 11 CR 399 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| ALI CLAY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

On June 7, 2011, Defendant Ali Clay was arrested for selling crack cocaine to a confidential informant working for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). After he was arrested, Defendant allegedly spoke with ATF Special Agent Labno about the drug deal. Thereafter, Defendant was transported to ATF's office, where the Government contends that he waived his Miranda rights, both orally and in writing, made an oral statement to ATF Special Agents, and executed an affidavit containing portions of his oral statement. Defendant was later charged with three counts of distributing mixtures and substances containing cocaine base, in violation of 21 U.S.C. § 841(a)(1). On July 23, 2012, Defendant filed a motion to suppress post-arrest statement [36], "seek[ing] to invalidate [his] waiver and suppress [his] post-arrest] statement as being made in violation of his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel."[1] For the reasons below, Defendant's motion [36] is denied.

**I.    Background**

The Seventh Circuit has described "the resolution of a motion to suppress" as a "fact-intensive inquiry" in which the district court must make "credibility determinations" based on "its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the

---
[1]  Defendant has since conceded that his motion does not implicate the Sixth Amendment.

witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see also *United States v. Springs*, 17 F.3d 192, 194 (7th Cir. 1994) (explaining the deference given to the credibility determinations of the district judge who has "heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe"). Both parties agreed that the Court should hold an evidentiary hearing to resolve Defendant's motion, and the Court convened a suppression hearing on November 1, 2012. During the hearing, counsel for Defendant Clay and counsel for the Government presented the testimony of four witnesses: Defendant Ali Clay, ATF Special Agents Christopher Labno and Rene Marano, and Bureau of Prisons Lieutenant Cleveland Swan. After considering the testimony of the witnesses and assessing their credibility, the Court sets forth the following recitation of the facts surrounding the encounter between Clay and the law enforcement officers that gave rise to the federal charges against Clay and the motion to suppress currently before the Court.

At approximately 6:00 p.m. on June 7, 2011, Defendant Clay was arrested as part of planned buy-bust after a controlled purchase of narcotics to an ATF confidential informant. The transaction originally was scheduled to occur around 109th and Michigan South Avenue in Chicago; however, shortly before the transaction, Clay contacted the confidential informant and changed the location to the Jewel Osco parking lot at 95th and Stony Island. According to Agent Labno, shortly after the controlled buy, agents pulled over the vehicle in which Defendant was riding and Defendant was arrested. There were four other individuals in the vehicle at the time of the stop. While one of the other occupants of the car was briefly handcuffed, none of the other occupants were arrested and they were released after the stop. Labno arrested Defendant, handcuffed him, and placed him in an ATF vehicle. Labno testified that Defendant made statements that led Labno to believe that Defendant was interested in cooperating and that he

could make incriminating statements. Labno testified that he advised Defendant of his rights in "basically plain English" rather than reading from the card that he carries. Defendant denies that Labno advised him of his rights. Labno testified that Defendant did not appear impaired and that Defendant said that he understood his rights and indicated his intent to waive them because he wanted to cooperate. According to Labno, Defendant then made incriminating statements regarding the transaction he had just completed, stating that he knew who had set him up, that he had just sold a "63" of crack, and that Defendant had with him the cash that he received for the transaction.

After this initial conversation, agents transported Defendant to ATF's offices in Chicago. On cross-examination, Labno was asked about the other occupants in the car. Initially, he testified that he told Defendant that the other occupants of the vehicle had been released "about halfway through the interview at the ATF office." Later, he stated that he told Defendant that they would be released while he was driving Defendant away from the scene of the arrest. Labno also testified that he and Clay did not have any "substantive" conversations during the transport to ATF's office.

Upon their arrival at ATF, Defendant was placed in an interview room and was offered food and something to drink, which he declined. Labno and Cook County Sheriff Investigator Jeff Lange left Defendant in the room for a short while to collect some materials and then returned to interview him. Labno testified that he started the interview by again advising Defendant of his rights, this time with the assistance of ATF's printed advice-of-rights form. Labno testified that he placed the form in front of Defendant, asked if he could read and write, and again read each of Defendant's rights to him. According to Labno, Defendant stated that he read and understood the form and then signed it. Labno and Lange witnessed Defendant's

signature and memorialized it at 7:28 p.m. This document was signed by Clay in blue ink, by Labno in blue ink, and by Lange in black ink. Defendant testified equivocally in regard to the advice-of-rights form. At multiple points he stated his belief that he believed that he signed the advice-of-rights form at the end of the interview, and not at 19:28 as indicated on the form, but at other times he said that he was not certain *when* he signed it, only that he signed it at some point.

Labno testified that Defendant was calm and cooperative and that he did not appear impaired in any way. Defendant twice asked if he could smoke, and Labno brought him down to the building's loading dock. Labno testified that Defendant knew he was "in trouble" and wanted to cooperate. According to Labno, he told Defendant that he could not make any promises, but that he would bring Defendant's cooperation to the attention of the U.S. Attorneys Office. Defendant also testified that the agents said they would "have to talk to the prosecutor." However, Defendant later testified that Labno told him that if he cooperated, he would be released. Defendant also stated that he was told that the prosecutor was in the next room and was interested in his cooperation. Defendant further testified that he asked about the other occupants of his vehicle around this time and Labno told him that they were in the next room and that once Clay had completed cooperating with the agents, he and the others could leave together.

According to Labno, Defendant then made incriminating statements to Labno and Lange regarding his drug and gun trafficking activities. As part of that statement, Labno showed Defendant several photographs related to ATF's investigation. With regard to each, Labno testified that he had Defendant initial the photo, and Labno memorialized Defendant's statement about the photo on the photo itself. Labno stated that during the interview Defendant identified the buyer in the transaction at "Poochie Man" and said that he had done at least a dozen deals

with him. Labno testified that Defendant admitted that he had been engaged in drug dealing from 2009 to the present, selling on average between 63 grams to an eighth of a kilo of crack every three to four days. Labno calculated the low end total for that period and told Defendant it added up to 11 kilos of crack, which Defendant admitted was a sizeable amount. Defendant testified that it was his understanding that he was being evaluated for suitability as a confidential informant and so he exaggerated his drug dealings to appear to be a significant player. Labno also testified that Defendant told him that he had given a .22 gun to a man named Flukie who had later sold the gun to Poochie Man, and Defendant described another individual who supplied guns, telling the agents which exits he had taken in Northern Indiana to visit that individual.

On cross-examination, defense counsel asked Agent Labno about the ink colors on the exhibits. Labno appeared to be using black ink on most of the documents. He testified that he had written in black on Government Exhibits Photo 2, 3, 4, 5, and 8, and that Defendant had placed his initials on Government Exhibits Photo 2, 3, 4, 5, 6, 7, 8, and 9 and had inserted the date on Government Exhibits Photo 1, 2, 3, 4, 5, 6, 7, 8, and 9. Labno further noted that the initials "A.C." on Government Exhibits 4 and 8 were in black while the others were in blue. Labno testified about the significance of the different colors of ink on the documents: "We used a different color pen later on because while he [Clay] initialed it when I first showed it to him, the 'AC', I had asked him to date it and he did not, and then he went back and said he didn't date it so he had to go back and date it with a different pen later on when we were -- later in the interview." Labno further testified that the blue pen was used later in the interview when he and Clay were reviewing the statement: "I gave him his own pen, which happened to be blue." But Labno also testified that they had "the blue and the black pen the entire time we were there. We

5

switched between them. I made a specific concerted effort at the end during the statement to have him use the blue pen specifically." Defendant did not recall switching pens.

At the conclusion of the interview, Labno asked Defendant if he was willing to memorialize his statement in writing, to which Defendant allegedly agreed. Labno then wrote out a statement for Defendant, which he gave to Defendant to review. Defendant testified that when he reviewed Labno's written version of his statement, he noticed that several changes had been made to what he said and also noticed that the statement included information that he had not provided. According to Defendant, at that point he asked to speak to a lawyer, but was told that if he spoke to a lawyer, he would not be able to cooperate ever. Defendant made a few changes to the statement and initialed those changes. Defendant then signed the statement, which was witnessed by Labno and Agent Marano, who had come into the interview while it was ongoing. According to the Government's exhibit, the statement was witnessed at 9:57 p.m. Labno then asked Defendant to sign a 17-hour waiver of his presentment before a magistrate, which Defendant signed. Agent Marano testified that at the end of the interview "Agent Labno went back and decided to kind of just make sure everything was correct." Agents Labno and Marano testified that Defendant did not appear impaired in any fashion, that he was cooperative, that they did not attempt to coerce Defendant into making any statement, and that Defendant never requested a lawyer.

After the statement was prepared, Labno and Marano consulted with the U.S. Attorney's Office, and a decision was made that Defendant should not be released from custody. Defendant was transported to the MCC to be held in custody in advance of an initial appearance the next day. In advance of taking Defendant to the MCC, Labno testified that he asked defendant about his health status so that they would not encounter any issues with his admission to the MCC.

According to Labno, Defendant said nothing about being intoxicated or impaired. Upon Defendant's arrival at the MCC, Lieutenant Cleveland Swan served as the intake officer. He testified that, based on his review of Defendant's intake form, Defendant did not appear to be impaired or intoxicated when he arrived. He also testified that if a prisoner arrives "impaired or intoxicated," he would not be put into the general prison population. On the intake screening form, Swan deemed Clay appropriate for general population and did not note any problems with his general physical appearance.

Defendant Ali Clay testified that on the evening of June 6, 2011, he attended a party. Prior to the party, he allegedly drank two fifths of Grey Goose vodka. He also smoked several blunts of marijuana through the day. At the party, he had another "5 or 6 blunts [of marijuana] and probably a fifth or two of Gray [sic] Goose." Additionally, he testified that he took an Ecstasy pill around 9:00 or 10:00 p.m., and that he left the party around 1:00 or 2:00 a.m. and returned home. However, he did not sleep; instead, he smoked more marijuana, in an effort to stay awake because he had a court appearance at approximately 10:00 a.m. on the morning of June 7. After returning from court, Defendant testified that he smoked another four or five blunts of marijuana and took another Ecstasy pill around 2:00 or 3:00 p.m.

During his intake at the MCC, he also filled out a MCC Psychology Services Inmate Questionnaire. On the form, he indicated that he had used Ecstasy and marijuana and that he was withdrawing or detoxing from that use. He did not indicate the date or time of his "last use." The urine sample that Defendant provided on July 8, 2011, tested positive for marijuana and cannaboids. In his motion, affidavit and testimony, Clay now alleges he was sufficiently impaired as to render his waivers involuntary, and that ATF agents took advantage of his impaired condition to coerce him.

7

## II. Analysis

### A. Legal Standard

For a criminal defendant's post-arrest statement to be admitted into evidence against him during a criminal trial, the government must be able to demonstrate by a preponderance of the evidence that the defendant waived his Miranda rights before making the statement. *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2261 (2010). A defendant may waive his Miranda rights "only if that waiver was made 'voluntarily, knowingly and intelligently.'" *United States v. Carson*, 582 F.3d 827, 833 (7th Cir. 2009) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). More specifically, the waiver inquiry "has two distinct dimensions." *Burbine*, 475 U.S. at 421. A waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Additionally, a waiver must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

In determining whether a defendant waived his Miranda rights "voluntarily, knowingly and intelligently," courts evaluate the "totality of the circumstances" surrounding the waiver.[2] *Burbine*, 475 U.S. at 421. The Seventh Circuit has identified a number of factors relevant to this inquiry, including "the nature and duration of the questioning, whether the defendant was prevented from eating or sleeping, and whether the defendant was under the influence of drugs or alcohol." *Watson v. Detella*, 122 F.3d 450, 453 (7th Cir. 1997). Courts also consider "the defendant's age, intelligence, education, and experience with the criminal justice system." *Id.* According to the Seventh Circuit, "absent a showing of some type of official coercion * * * a

---

[2] Although whether a defendant made a knowing and voluntary waiver of his Miranda rights is a separate inquiry from a claim challenging the voluntariness of a confession, *Etherly v. Davis*, 619 F.3d 654, 662 (7th Cir. 2010), "in evaluating whether a [defendant] voluntarily waived [her] Miranda rights, [courts] consider the same factors * * * consider[ed] * * * in assessing the overall voluntariness of a confession." *Ruvalcaba v. Chandler*, 416 F.3d 555, 562 (7th Cir. 2005).

8

defendant's personal characteristics alone are insufficient to render a confession involuntary." *Id.* That said, "[w]hen interrogating officers should reasonably have known that a suspect was under the influence of drugs, or alcohol, 'a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." *United States v. Haddon*, 927 F.2d 942, 946 (7th Cir. 1991). Courts generally will hold that a defendant's waiver is knowing and intelligent if he "understands that he can refuse to talk to the people asking him questions or stop the questioning once it begins; that the people asking him questions are not his friends but are police or law enforcement personnel who are trying to show he is guilty of a crime; that he can ask for and get a lawyer who will help him; and that he does not have to pay for that lawyer." *Collins v. Gaetz*, 612 F.3d 574, 588 (7th Cir. 2010). "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the Miranda warnings that the courts have found an unintelligent waiver." *Id.*

    B.    **Advice of Rights**

Defendant contends that he testified more credibly at the suppression hearing than Agent Labno about the events following his arrest on June 7, 2011. He contends that he was not advised of his rights prior to his statement being taken and that the evidence is more probable that the advice-of-rights form was only executed at the end of the interview. In support of his contentions, he relies on his testimony and the fact that both blue and black ink were used to sign, initial, and annotate the forms and pictures presented to him, including the advice-of-rights form.

In contrast, ATF Agent Labno testified credibly that he advised Defendant of his Miranda rights and explained those rights to Defendant in "plain English" both immediately after the arrest and at the ATF offices. According to Labno, Defendant waived his rights and agreed to

9

speak with Labno because he wanted to cooperate. In the first instance, Defendant waived his rights orally, and at the ATF's offices, Defendant orally indicated that he was waiving his rights and also signed an advice-of-rights form further indicating as much. There is no dispute that Clay signed the advice-of-rights form. The only disputes are whether he (i) signed it prior to questioning at the ATF's office or at the conclusion of the interview and (ii) was coerced into signing the form.[3]

Defendant's theory is that the use of blue and black pens suggests "there was no advise of rights before the Statement was taken and that the evidence is more probable that the 'Advice of Rights' form was only executed at the end of the interview." Labno explained that he and Defendant used multiple pens during the interview and that he made "a concerted effort to use at the end during the statement to have him use the blue pen specifically." Labno's earlier testimony on this point was not inconsistent. Defendant cites Marano to support his theory, but Marano's testimony actually supports the Government's theory. Marano testified that he was present at the end of the interview when the written statement was finalized and Defendant signed it. Yet Marano did not observe the execution of the advice-of-rights form. If Marano had been present when the advice-of-rights form was executed, he would have been a witness on the form. Instead, Lange was the witness to the form's execution. This is consistent with the fact that the form was executed at the beginning of the interview because Lange was present for the first portion of the interview.

Moreover, Defendant was not certain as to when he signed the form:

Q. And again, to the best of your recollection, you don't recall being advised of your rights prior to making this statement, is that correct?

A. I know I ain't signed that paper. I don't think I did. I probably did, but I don't

---

[3] The Court addresses Defendant's coercion argument in the next section, which assesses whether Defendant knowingly and voluntarily waived his rights.

> remember. They probably could have advised me of my rights, but I don't remember.

Furthermore, Defendant cannot remember consciously switching pens; however, the testimony and exhibits show that he used both colors at times during the interview. In sum, the agents' testimony, the fact that Defendant did sign the form, and the fact that the witnesses to the form are consistent with the Government's position and not Defendant's all suggest that Defendant was properly advised of his Miranda rights and sufficiently overcome Defendant's testimony that he was not so advised. The Government has satisfied its burden of demonstrating by a preponderance of the evidence that Defendant was advised of his rights.

### C. Waiver of Rights

Defendant also maintains that evidence of his impairment and the coercion and tricks used by the Government indicate that the statement was not one "voluntarily" given. In support of his position, Defendant points to his own testimony, the intake form at the MCC, which indicates at Question 11 that Clay was "withdrawing" from alcohol or drugs at the time of his admission, alleged inconsistencies in the agents' testimony, and the fact that his urine analysis taken on the day after his arrest tested positive for marijuana and cannaboids. As set forth below, the evidence does not support Defendant's theory that his cooperation was not voluntary.

There is no evidence of (nor does Defendant) suggest that the agents or anyone else used physical violence or threatened violence to cause Defendant to waive his Miranda rights. In light of this, Defendant argues that the agents employed deceptive interrogation tactics to persuade Defendant to waive his Miranda rights. As an initial matter, Defendant admitted that Labno did not employ any of the deceptive interrogation tactics Defendant alleged in his motion during their first discussion immediately following Defendant's arrest. Rather, he testified that these tactics allegedly took place at ATF's offices. With respect to Defendant's interview at ATF's

offices, Labno explained that he never took any steps to try to trick or coerce Clay into making a statement. Marano also testified that during the portion of Defendant's interview for which he was present, neither Labno nor anyone else tried to trick or coerce Defendant into making a statement. Defendant maintains that Labno testified inconsistently regarding when he "first told" Defendant that the other occupants of the car had been released because Labno testified that he and Defendant did not converse on the way to the ATF offices. Labno actually testified that they did not have any "substantive conversations" during the car ride to ATF's offices. Consistent with that testimony, Labno later explained that Defendant made "a passing comment" as to the other occupants as they were driving away from the scene of the arrest, and then Defendant "brought it back up again" later. Labno explained that he never told Defendant that ATF was holding the other occupants from the car and that they would not be allowed to leave unless Defendant gave a statement. Marano confirmed that he never heard anyone make such a threat. Instead, Labno testified that he initially told Defendant the other occupants "would" be released and later told him that they had been released.

Defendant also maintains that the agents told him that if he asked for a lawyer, he would not be able to cooperate, and that if he instead cooperated, he would be free to leave. On this point, the Court does not find Defendant's testimony to be credible. Both agents testified that Defendant did not request a lawyer. Labno specifically mentioned the possibility of future cooperation after Defendant had seen a judge. While Labno discussed the possibility of Defendant cooperating proactively, it is simply not plausible that he would have told Defendant that if he gave a statement or cooperated, he would be free to leave. Instead, Labno told Defendant that the agents "would make all of his cooperation known to the U.S. Attorney," a representation which is entirely appropriate. See, *e.g*, *United States v. Charles*, 476 F.3d 492,

12

497 (7th Cir. 2007) (concluding that a confession induced by a promise "to bring cooperation by the defendant to the attention of prosecutors [did] not render a confession involuntary"). As for "[t]he decision whether or not [defendant] would * * * be released to cooperate with us that night or cooperate in custody with us, whether he would go see a judge and cooperate afterwards, if his lawyer so agreed," Labno told Defendant that "all that stuff was up to the prosecutor and up to the judge." Marano further confirmed that during the portion of Defendant's interview for which he was present, no one told Defendant that once he made a statement he would be allowed to go home. In fact, Defendant himself testified that at the start of the interview, the agents said that they would "have to talk to the prosecutor." This testimony casts doubt on his assertion that he was told he would be allowed to leave following his cooperation.

Multiple factors suggest that Defendant's waiver of his Miranda rights was voluntary and intelligent. First, at the time of his arrest, Defendant was in his early thirties, high school educated, and, by his own account, could "read and write very well." See, *e.g.*, *Holland v. McGinnis*, 963 F.2d 1044, 1052 (7th Cir. 1992) (considering whether a defendant "was not disadvantaged by youthful ignorance or the naivete born of inexperience."). Defendant had three prior felony convictions, suggesting familiarity with the criminal justice system prior to speaking with the agents. See, *e.g.*, *Lord v. Duckworth*, 29 F.3d 1216, 1223 (7th Cir. 1994) (identifying the fact that "[a]t the time of his interrogation, Lord was 35 years old and had experience with the criminal justice system by virtue of two prior felony convictions" as one of several factors that led to the conclusion that defendant's confession was voluntary); *United States v. Ross*, 510 F.3d 702, 710 (7th Cir. 2007) (citing defendant's "significant experience with the criminal justice system because of his prior convictions" as one of several factors leading the court to conclude that defendant's confession was voluntary). Labno spent a total of four hours with Defendant,

13

and he was not questioned the entire time. Instead, the interview lasted approximately 2.5 hours, during which time Defendant was permitted to take two 10-15 minute breaks to smoke cigarettes outside of ATF's offices and was offered food and drink. Additionally, the fact that Defendant admitted almost immediately his role in one of the deals charged demonstrates that his waiver was not the result of hours of intensive questioning. See, *e.g.*, *United States v. Ross*, 510 F.3d 702, 710 (7th Cir. 2007) ("The entire interview lasted five hours, but Ross's confession came within ten to fifteen minutes after inspectors initiated questioning; so he cannot argue he was worn down before he confessed."). Furthermore, although Defendant was handcuffed when he was arrested, he was not restrained during the interview at ATF's offices except when the agents left Defendant in the room by himself. And finally, there is no evidence that Defendant sought rest while in ATF's custody. Indeed, Defendant admitted that when he was taken into custody he never told anyone he was tired.

The closest question is whether Defendant was under the influence of drugs or alcohol to such an extent that he could not have knowingly, voluntarily, or intelligently waived his rights. Citing his own testimony about drug and alcohol use, Defendant has alleged that he was "obviously incapacitated" when questioned by the agents. The evidence shows otherwise. First, just prior to his arrest, Defendant switched the location of the transaction and then arrived at the new location in a timely fashion. He then finalized a drug deal worth approximately $1,700.00. Moreover, consistent with the agents' testimony, Defendant acknowledged that when he was arrested, he did not tell anyone that he had smoked marijuana, taken an ecstasy pill, or was high, intoxicated, or otherwise "messed up." Equally telling, Swan's decision to place Defendant into the MCC's general inmate population and not a special housing unit, as well as Swan's lack of a notation regarding Defendant's appearance, indicates that Swan did not believe that Defendant

was intoxicated or otherwise impaired. Although Defendant's brief suggests that he told Swan about his drug use and Swan recorded it on the MCC's Psychology Service Inmate Questionnaire, Defendant actually filled out this form, not Swan. And while Defendant checked "ecstasy/club drugs" and "marijuana" in response to the temporal-less inquiry, "Which of the following drugs have you used?," Defendant answered "NO" to "Has your use of alcohol or drugs ever created problems for you?" Also, Defendant did not indicate from what substance he was withdrawing, or the last time he used that substance.[4]

Finally, and perhaps most damning, Defendant's own testimony made clear that he was not "obviously incapacitated." According to Defendant, he was engaged in a multi-pronged effort to obtain a favorable cooperation deal. Defendant supposedly was exaggerating both the extent of his crack cocaine sales and his involvement with firearms. Additionally, Defendant repeatedly explained that he conditioned his willingness to waive his Miranda rights on the concreteness of a cooperation deal. See, *e.g.*, T. 162-163 ("And I don't think I signed that Advice of Rights right then. I probably could have, but I don't think I did because I wasn't going to sign nothing, just -- I wasn't going to get locked up and just come dead end and just sign the statement without nothing, without them telling me 'Oh, you're going to get out.' No, it wasn't going to happen like that."). Defendant carried on lengthy conversations with the agents about multiple drug deals, and never mentioned being high, intoxicated, or otherwise impaired. In sum, Defendant's strategic behavior in trying to secure a favorable outcome after being caught in

---

[4] Defendant also highlights a United States Pre-Trial Services finding that detected marijuana and cocaine in his system on June 8, 2011. While the Court has considered this evidence to indicate that at some time in Defendant's recent history, he used drugs, this finding does not indicate the quantities of the drugs Defendant used, the last time Defendant used these drugs prior to his arrest, or how long any effects these drugs might have had on Defendant would be detectable after his last use thereof. Therefore, the Court concludes that the Pre-Trial Services' finding does not overcome the evidence that indicates that his waiver was voluntary and knowing.

15

a controlled buy cuts directly into his theory that he was too impaired to properly waive his rights.

Although the Court finds Defendant's own conduct leading up and during to his arrest—primarily, the significant drug transaction that he helped organize and in which he participated and then the level of detail that he undisputedly provided to the agents during his interrogation—to be the biggest barrier to his theory that he was too impaired to voluntarily and knowingly waive his rights, Defendant's testimony also cuts against that finding. In addition to the lack of credibility identified above, Defendant's testimony at the hearing included several new assertions omitted from his motion and affidavit (filed prior to the suppression hearing). While a motion and supporting affidavit often do not contain every detail elicited by way of testimony, the quantity and nature of Defendant's new assertions on direct examination concerning the extent of his drug and alcohol use, which are absent from his pre-hearing filings, are somewhat suspect. A main component of Defendant's motion and affidavit was the notion that Defendant's drug use rendered him "obviously incapacitated." Yet Defendant's filings did not include Defendant's testimonial assertions that he (1) consumed massive quantities of alcohol, (2) took additional ecstasy, (3) smoked additional marijuana (including in the car on the way to the crack cocaine deal with the young girl sitting next to him), and (4) attended a party and stayed up the entire night before he was arrested. These assertions go directly to his theory that he was "obviously incapacitated."

Furthermore, Defendant's own testimony was that he did not request a lawyer until the end of the interview, when he was reviewing his written statement, which he ultimately signed. If Defendant had been concerned about the presence of a lawyer, he likely would have requested one before giving a detailed confession, not as the interview was concluding. In light of the

agents' testimony that he never requested a lawyer, the level of detail of his confession, and the fact that Defendant himself testified that the agents told him at the start of the interview that they would need to talk with the prosecutor before offering him a deal, Defendant's testimony that he requested a lawyer at all (and specifically not until the end of the interview) is simply not credible.

Looking at the totality of the circumstances, the Court concludes that the Government has carried its burden of proving by a preponderance of the evidence that Defendant was given his Miranda rights and that he knowingly and voluntarily waived those rights. Defendant's conduct before, during, and after the interview as well as his hearing testimony suggest that he was behaving strategically at the time of his interview and was not "obviously incapacitated." Further, the evidence does not suggest that Agent Labno affirmatively misled Defendant in order to obtain the waiver or that any misinformation materially affected Defendant's decision to waive his right. Instead, the evidence suggests that Defendant knew that he was "in trouble" and was willing to cooperate to try to balance out his obvious involvement in the drug bust.

### III. Conclusion

For these reasons, the Court denies Defendant's motion to suppress post-arrest statement [36]. The Court also denies Defendant's motion in limine regarding suppression hearing [58] for the reasons stated on the record in open court on October 31, 2012, and November 1, 2012.

Dated: December 10, 2012      _____
                                                Robert M. Dow, Jr.
                                                United States District Judge